AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Middle District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. 8 : 2 4 M J 2 8 0 7 CPT |
| Jonathan Ortega-Martinez | ) | |
| | ) | |
| | ) | |
| _Defendant(s)_ | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  December 2023, to November 2024  in the county of            Polk            in the

     Middle      District of        Florida       , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC 933 | Firearms trafficking, including conspiracy and attempt qu |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

_____
_Complainant's signature_

SA Dwayne  Smith, ATF
_Printed name and title_

Sworn to before me over the telephone or other reliable electronic means and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d).

Date:  November 20, 2024

_____
_Judge's signature_

City and state:            Tampa FL

CHRISTOPHER P. TUITE, USMJ
_Printed name and title_

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Dwayne Smith, Special Agent ("SA") of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), being duly sworn, do depose and state the following.

1.      I have been employed as a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) since February 2022. I have approximately nine years of law enforcement training and experience. This training and experience include but are not limited to, earning a Bachelor of Science Degree in the field of Criminal Justice from the University of Central Florida. I was subsequently employed as a Special Agent for the Naval Criminal Investigative Service (NCIS) for approximately four years.

2.      Prior to my employment with NCIS, I was employed with the Customs and Border Protection (CBP) as a federal law enforcement officer for approximately three years. During my time in law enforcement, I have specialized in numerous major criminal investigations including, but not limited to, terrorism, counterterrorism, counterintelligence, espionage, adult sexual assaults, child sexual assaults, human trafficking, internet crimes against children, homicide, suicide, firearm offenses, armed violent offenses, narcotics offenses, and the trafficking of both firearms and narcotics. I have written and/or executed federal search warrants relating to terrorism, espionage, counterterrorism, firearms offenses, narcotics offenses, and sexual assault offenses. I have conducted and/or participated in

1

investigations resulting in the seizure of contraband, classified materials, firearms, and narcotics. Prior to my law enforcement career, I served in the United States Army for approximately nine years and served with and alongside the 75th Ranger Regiment and 82nd Airborne Division.

3.     I make this affidavit in support of a criminal complaint for Jonathan ORTEGA-MARTINEZ. Specifically, I believe there is probable cause that ORTEGA-MARTINEZ violates 18 U.S.C. § 933 (Firearms Trafficking).

4.     The information set forth in this affidavit is based upon my own personal knowledge as well as information provided to me by other law enforcement officers and additional sources identified in this affidavit and is provided solely for the purpose of establishing probable cause. Because this affidavit is submitted for the limited purpose of establishing such probable cause, it does not include all of the details of this investigation of which I am aware.

5.     The following affidavit is based on my personal experience and involvement in this ongoing investigation, my conversations with other law enforcement officers, and my examination of documents and evidence related to this case. The following statements are true and correct to the best of my knowledge.

## Probable Cause

6.     On or about August 8, 2023, ATF Agents assigned to the Tampa-III 'SPARTA' Group initiated a firearms trafficking investigation involving and organization illegally obtaining firearms within the Middle District of Florida and smuggling these firearms to the Dominican Republic. I believe these firearms

2

trafficking organization utilizes "straw purchasers" to obtain firearms. Straw purchasers are individuals who obtain firearms from federal firearms licensees (FFLs) on behalf of other individuals.

7.    On or about December 23, 2023, agents from ATF Tampa-III seized six Glock pistols from an individual hereinafter referred to as the "Cooperating Defendant One," or "CD1." During an interview with agents, the CD1 advised he routinely purchases firearms and resells them to various individuals.

8.    On or about February 13, 2024, ATF Agents executed federal search warrants at the CD1 residents located in Polk County, FL. During those search warrants, agents seized three firearms, approximately 4,000 thousand rounds of assorted ammunition, various tactical equipment, and documents showing the illegal sale of firearms to various individuals. Below is a photograph of the items seized from the execution of the search warrants.



9.      On or about February 16, 2024, ATF Agents conducted an interview with the CD1. The CD1 advised over the past year, he has sold approximately 120 firearms to an individual hereinafter referred to as the "Cooperating Defendant two," or "CD2." The CD identified several pictures of CD2.

10.     In addition to the CD1's statements, agents reviewed text message conversations between the CD1 and CD2. Agents noted multiple messages showing CD1 obtaining firearms on behalf of CD2 and selling them to CD2. These messages dated back to the summer of 2023 and occurred weekly and sometimes daily.

11.     Based on ATF Trace Reports, agents identified at least four firearms the CD1 purchased and later sold to CD2, four of the firearms were recovered at crime scenes in the Dominican Republic.

12.     CD1 advised that CD2 would pay the CD1 directly with cash and also utilized forms of electronic payment, such as the Zelle application. Agents calculated, and the CD1 confirmed, that CD2 paid the CD1 approximately $50,000 for firearms purchases in 2023.

## SEARCH WARRANT – Kissimmee, FL

13.     On or about April 18, 2024, agents from ATF, HSI and the Osceola County Sheriff's Office (OCSO) executed a federal search warrant at CD2 residence, Agents seized the following items during the search warrant:

- 57 firearms, including 46 pistols, 9 rifles, and 2 shotguns;
- 170 lbs. of assorted ammunition;
- 401 magazines; (186 high capacity)
- 19 empty pistol boxes;

- 38 concealment holsters;
- $16,640 in U.S. currency;
- Two money counters;
- Large quantities of firearms parts, including barrels, gun lights, optics, scopes, stocks, and other items, and
- A ledger containing over sixty names of suspected straw purchasers with payments to each.

Below is a photograph of the seized evidence:



14.    During the execution of the search warrant, CD2 was detained without incident. However, Jonathan Rafael ORTEGA-MARTINEZ remained hidden inside an upstairs bedroom, and agents were forced to make entry into the bedroom to detain him prior to the search. ORTEGA-MARTINEZ advised that he was sleeping in bed and did not hear law enforcement calling out for him, despite agents stating, "Police, please come out" several times, in both English and Spanish. Agents noted that ORTEGA-MARTINEZ was wearing jeans and was found under

the comforter of the bed, not underneath the sheets. Below are pictures of evidence found in the bedroom where ORTEGA-MARTINEZ was located, which included firearms, ammunition, firearm boxes, and other firearm accessories.





15.     Agents then conducted a recorded interview of ORTEGA-MARTINEZ. Agents advised him of his rights under *Miranda,* and ORTEGA-MARTINEZ subsequently waived his right to have an attorney present and agreed to participate in the interview. It was obvious that during the interview, ORTEGA-MARTINEZ continued to provide false statements. Agents then stated they would contact ORTEGA-MARTINEZ if they had further questions. ORTEGA-MARTINEZ provided agents with his PII information and provided the address 213 Wildflower Road, Davenport, Florida, 33837, as his home address of record (the address was a different address than is provided on his driver's license). At the time, agents allowed ORTEGA-MARTINEZ to leave the residence without further incident.

16.     Agents conducted a recorded interview of CD2. Agents advised him of his rights under *Miranda* and CD2 subsequently waived his right to have an attorney present and agreed to participate in the interview.

17.     CD2 advised that for over a year, he had been obtaining and storing firearms at his residence for his "boss." CD2 referred to his boss as "Enano" or "Michael," and later positively identified a photograph of Maicor Eliud CEPEDA-GARCIA as this individual.

18.     CD2 stated that he was introduced to CEPEDA-GARCIA when CD2 was seeking a loan for his construction business. CD2 stated that CEPEDA-GARCIA, who was from the Dominican Republic, gave him a loan of approximately $6,000. In lieu of interest, CD2 agreed to store firearms for

7

CEPEDA-GARCIA at his residence. CD2 stated for over a year, he had been receiving firearms from various individuals on behalf of CEPEDA-GARCIA.

19.     CD2 then identified ORTEGA-MARTINEZ as an additional individual working for CEPEDA-GARCIA in obtaining firearms. CD2 advised that ORTEGA-MARTINEZ was the "righthand man" for CEPEDA-GARCIA. CD2 advised CEPEDA-GARCIA and ORTEGA-MARTINEZ would retrieve firearms from his residence on a weekly basis and ship them to the Dominican Republic. CD2 stated that he used cell phones to communicate with CEPEDA-GARCIA and ORTEGA-MARTINEZ and provided their phone numbers.

20.     CD2 later elaborated that he and ORTEGA-MARTINEZ went to Tampa, FL, the night prior (April 17, 2024), to obtain firearms from an unknown individual. After obtaining the firearms, they drove to Miami, FL, and then back to CD2's residence in Kissimmee, FL. CD2 advised they drove his Cadillac SUV. Based on surveillance activity that night, April 17, 2024, agents were able to corroborate CD2's account of his location and vehicle he was driving. Agents seized eight firearms from the Cadillac SUV during the execution of the search warrant. Below are photographs of the evidence seized in the SUV.

 

21.     Following the interview, CD2 identified residence at 199 Ronda Court, Davenport, Florida, 33837, where CEPEDA-GARCIA lives. In addition CD2 identified a gray Infinity Q50 bearing FL tag 16DTZV, which he said was frequently driven by ORTEGA-MARTINEZ and CEPEDA-GARCIA. CD2 explained that if found out of the information provided, his life would be in danger.

22.     CD 2 has no felony convictions. However, I am aware CD 2 has a pending warrant and criminal charge from outside the United States for a violent crime. CD 2 has an attorney, has signed a plea agreement, and is expected to plead guilty pursuant to a plea agreement with the United States. Specifically, CD 2 will be pleading guilty to firearms trafficking, dealing in firearms without a license and an immigration related offense. No other promises have been made to CD 2 or his attorney.

23.     On or about April 21, 2024, three days after the search warrant, ORTEGA-MARTINEZ booked a flight from Orlando, FL, to the Dominican Republic. Utilizing border authority search, Customs and Border Protection (CBP) seized ORTEGA-MARTINEZ's cellphone device.  ORTEGA-MARTINEZ provided the address of 199 Ronda Court, Davenport, Florida, 33837, to CPB as his home address of record.

24.     On April 22, 2024, four days after the search warrant, CEPEDA-GARCIA booked a flight from Orlando, FL, to the Dominican Republic. Utilizing border authority search, CBP seized CEPEDA-GARCIA's cellphone device. CEPEDA-GARCIA also provided the address 199 Ronda Court, Davenport,

9

Florida, 33837, as his home address to CBP when surrendering his cellphone.

### Proffer of CD2

25.    On May 9, 2024, a proffer with CD2 was conducted. CD2 was advised that no promises or assurances can be made for information he was willing to provide in the investigation. CD2 advised that he understood and was willing to provide information pertaining to his involvement in the firearms trafficking organization.

26.    CD2 reiterated his previous account that CEPEDA-GARCIA and ORTEGA-MARTINEZ are leaders in an organization that smuggles firearms to the Dominican Republic. CD2 elaborated that CEPEDA-GARCIA is the number one person in charge of the organization in the United States. ORTEGA-MARTINEZ is the second in command in the U.S., but CD2 advised there are additional bosses located in the Dominican Republic. CD2 reiterated his previous statement of receiving an interest-free loan from CEPEDA-GARCIA for approximately $6,000 in exchange for CD2 storing firearms at this residence.

27.    CD2 advised the "interest-free loan" agreement for storing firearms evolved into CD2 obtaining firearms directly from various individuals. CD2 also advised that he began assisting CEPEDA-GARCIA and ORGETA-MARTINEZ in concealing the firearms in various construction equipment prior to being shipped to the Dominican Republic.

28.    CD2 stated that CEPEDA-GARCIA and ORGETA-MARTINEZ ordered firearms from individuals online utilizing Floridaguntrader.com. Once the

firearms were ordered, the individuals would contact CD2 and deliver them to his residence. CD2 stated he would call CEPEDA-GARCIA and ORTEGA-MARTINEZ, who would come to his residence and pick up the firearms utilizing concealment methods. CD2 mentioned that CEPEDA-GARCIA and ORTEGA-MARTINEZ picked up firearms weekly from his residence utilizing the gray Infinity Q50.

29.    A query of the Florida Driver and Vehicle Information Database revealed that the Infinity Q50 is registered to ORTEGA-MARTINEZ.

30.    CD2 stated that he was also able to reach out to individuals on his own to purchase firearms for CEPEDA-GARCIA and ORTEGA-MARTINEZ. CEPEDA-GARCIA and ORTEGA-MARTINEZ stated that they would give CD2 $750 for each pistol purchased and $1,000 for each rifle. CD2 mentioned that he could keep the remaining amount if he could purchase firearms for a cheaper price. CD2 mentioned the largest amount of money he was paid for firearms he provided for CEPEDA-GARCIA and ORTEGA-MARTINEZ was $16,000.

31.    CD2 advised that one of his most frequent customers provided him with an estimated purchase of over 100 Glock pistols. These pistols were later transferred to CEPEDA-GARCIA and ORTEGA-MARTINEZ for shipment.

32.    Based on ATF Trace Reports, agents have found that multiple firearms CD2 received from CD1 were recovered in the Dominican Republic shortly after they were originally purchased from a federal firearm licensed (FFL) dealer. I know that an important consideration of firearms trafficking is the length of time

between the date of a firearm's last known purchase to the date of its recovery by law enforcement in connection with a crime. This time period is commonly referred to as "time-to-crime (or TTC)," which is measured in days. According to ATF statistics, the median TTC for firearms purchased in the United States and recovered by law enforcement outside the United States is 2,416 days (or 6.6 years). The "time-to-crime (or TTC)" for firearms recovered in the Dominican Republic, which CD1 purchased, is 7 days to 38 days. Based upon the investigation, I believe these firearms were sold to CD2 and then later obtained by CEPEDA-GARCIA or ORTEGA-MARTINEZ for shipment to the Dominican Republic.

33.     In addition to the statements, agents were able to retrieve security footage from CD2's residence, which shows CEPEDA-GARCIA and ORTEGA-MARTINEZ obtaining firearms. CD2 explained the video was taken in 2023, and on that day, he notified CEPEDA-GARCIA and ORTEGA-MARTINEZ that he had rifles stored at his residence. He stated that CEPEDA-GARCIA and ORGEGA-MARTINEZ arrived at his residence in the Infinity Q50. They went inside the residence and wrapped the rifles in black packaging to conceal the firearms and then loaded the firearms into ORGEGA-MARINEZs Infinity Q50. Photographs from the security footage are below, which display the firearms being transported from CD2's residence to the ORTEGA-MARTINEZs vehicle. CEPEDA-GARCIA is in the white shirt, and ORTEGA-MARTINEZ is in the yellow shirt.






34.     Agents obtained an additional video showing ORTEGA-

MARTINEZ packaging firearms in light fixture boxes. The firearms are wrapped in

a special black fabric, which CD2 advised was a method used by CEPEDA-

GARCIA and ORTEGA-MARTINEZ to conceal firearms during x-ray screening.

Below are still images captured from the video.



35.    CD2 mentioned that he had picked up money or provided firearms to

CEPEDA-GARCIA and ORTEGA-MARTINEZ numerous times.  While at 199

Ronda Court, Davenport, Florida, 33837, he witnessed CEPEDA-GARCIA and

ORTEGA-MARTINEZ packing firearms into home light fixture boxes to conceal

them and have them shipped internationally. CD2 added that he has also engaged in

conversation with CAPEDA-GARCIA and ORTEGA-MARTINEZ about the

firearms trafficking organization sending firearms to the Dominican Republic. Also,

at the residence, he witnessed CEPEDA-GARCIA and ORTEGA-MARTINEZ in

possession of large amounts of U.S. currency, which he estimated to be approximately two million dollars, shrink-wrapped into plastic bags. CD2 stated the money was in return for firearms being sold internationally. He further added that CEPEDA-GARCIA and ORTEGA-MARTINEZ regularly shipped out firearms utilizing concealment methods every Monday, Wednesday, and Friday to the Dominican Republic and Haiti, and they would receive around $2,500 per pistol and approximately $4,000 to $5,000 for rifles.

36.    From April 18, 2024, through the present, agents have conducted surveillance at 199 Ronda Court, Davenport, Florida, 33837. At the residence, agents have consistently observed CEPEDA-GARCIA, ORTEGA-MARTINEZ, and the Infinity Q50. During surveillance, it was also learned that ORTEGA-MARTINEZ no longer lived at the residence or at any of the addresses on record with the Floria DMV.

37.    On October 29, 2024, while conducting surveillance, agents monitored the Infinity Q50 (operated by ORTEGA-MARTINEZ) reverse into the driveway at 199 Ronda Court, Davenport, Florida, 33837. ORTEGA-MARTINEZ and CEPEDA-GARCIA began to unpack approximately three parcels from the vehicle. The parcels closely resembled the description and still images previously mentioned by CD2. The following are pictures captured from the surveillance video. At approximately 1:17: p.m., ORTEGA-MARTINEZ and CEPEDA-GARCIA entered the garage at the residence and closed the door behind them.





38.    At approximately 2:06 p.m., the garage door opened, and ORTEGA-

MARTINEZ and CEPEDA-GARCIA loaded two of the parcels into the Infinity

Q50. The following images depict the garage opening and the parcels being loaded into the vehicle.



ORTEGA-MARTINEZ can be seen carrying the first parcel towards the vehicle



ORTEGA-MARTINEZ can be seen placing the first parcel into the backseat of the vehicle



ORTEGA-MARTINEZ can be seen placing the second parcel into the backseat of the vehicle

39.    At approximately 2:10 p.m., ORTEGA-MARTINEZ and CEPEDA-GARCIA leave the residence in the Infinity Q50 and proceed towards the UPS store located at 8297 Champions Gate Blvd, Championsgate, FL 33896. The following images capture them leaving the residence at 2:10 p.m.



40.     At approximately 2:16 p.m., the vehicle can be seen passing the Publix and parking in the fire lane directly in front of the UPS store. The Publix is located on the east side of the UPS store and attached to the same shopping plaza.



41.     According to agents conducting the surveillance and based on Google Maps, the distance between the TARGET LOCATION and Publix, located at 8301 Championsgate, is 1.8 miles and can take approximately 7 minutes between locations. It took ORTEGA-MARTINEZ and CEPEDA-GARCIA approximately 6 minutes to arrive at the Publix.

42.     ORTEGA-MARTINEZ gets out of the vehicle and starts to take one parcel at a time into the UPS store while CEPEDA-GARCIA can be seen walking into the Publix. The following image captures the events.



43.    At approximately 2:17 p.m. CEPEDA-GARCIA enters the Publix.



44.    At approximately 2:25, ORTEGA-MARTINEZ returns to the vehicle and retrieves the second parcel. At this time, CEPEDA-GARCIA is outside observing the incident and avoids going near the UPS store.

20

45.     As mentioned, on October 29, 2024, ORTEGA-MARTINEZ brought two parcels that contained concealed firearms into the UPS located in Championsgate, FL. While inside UPS, ORTEGA-MARTINEZ provided a false name, address, and his phone number as (849) 284-0730.  The following is a photograph of shipping labels affixed to both parcels.

 

46.     Once all events were completed, agents contacted the UPS store and explained what had occurred to UPS's temporary store manager. The manager mentioned that an individual had come into the store and dropped off two parcels that matched the description provided. The manager noted that the boxes were listed as LED color-changing decorative flush mounts; however, the box seemed heavier than what was displayed on it. Due to the store closing, the manager agreed to hold the boxes until agents could have them examined.

47.     On October 30, 2024, agents met with the manager at the UPS store. The parcels matched the boxes observed taken from ORTEGA-MARTINEZ and CEPEDA-GARCIA to the UPS store during surveillance. The following are images

taken of the parcel.



48.      At approximately 2:00 p.m., an ATF Bomb Technician and ATF K9 handler conducted a free-air search of the parcels using his canine partner.

49.      The K9 conducted a free-air sniff of numerous packages of similar size and construction.  The K9 came to both parcels and alerted to the odor of one or more of firearms and explosives within the parcels. The K9 alerted by sitting in front of each parcel and staring at the source from which the odor was emitting.

50.      On November 5, 2024, a search warrant for the parcels was obtained. Once agents opened the parcels, they discovered that each parcel contained two rifle-style firearms and accessories.  The firearms were wrapped exactly as CD2 had explained previously.  Photographs of the parcels are below.











51.     Agents conducted a phone query of the number (849) 284-0730, which provided that the number is from Santo Domingo, Dominican Republic, ORTEGA-MARTINEZ's country of birth and the country to which these trafficked firearms were being sent. In addition, (849) 284-0730 is not registered with a cellphone provider.

52.     Also, on October 30, 2024, agents interviewed a UPS Sales Associate (SA). The SA was provided a DMV photograph of ORTEGA-MARTINEZ, whom the SA positively identified as the individual who brought the parcels to UPS. The SA stated that ORTEGA-MARTINEZ always presented himself as "Carlos Matos." The SA mentioned that the SA never checked ORTEGA-MARTINEZ's ID information when he or any individual ships packages. The SA stated that the SA has worked at UPS since January 2024 and has dealt with ORTEGA-MARTINEZ approximately 20 times. The SA specifically stated that ORTEGA-MARTINEZ always ships the same packages that match the parcel presently at the store. The SA added that during the summer of 2024, ORTEGA-MARTINEZ shipped approximately 6 of these parcels at once and estimated that he had shipped over 20 of these parcels during their time of employment.

53.     The SA then queried the UPS system for "Carlos Matos," which displayed no shipment history. They then queried the phone number (849) 284-0730, which displayed 23 shipment transactions. The query further revealed that all shipment transactions went to the same address, 8120 NW 66th St, Miami, FL 33166, which is listed as Global International Export Company. I know that Global

International Export Company ships items internationally.

54.     On October 31, 2024, at approximately 3:47 p.m., UPS clerks received a phone call from telephone number (561)-590-5700 . The individual identified himself as "Carlos Matos" and enquired about the parcels. The UPS clerk stated that "Carlos Matos" provided a tracking number, which matched that of the parcels ATF had seized. The UPS employee stated that she would check on the status of the parcels and return a call to him. "Carlos Matos" provided phone number (849) 284-0730.

55.     UPS advised agents that On October 31, 2024, at approximately 3:47 p.m., "Carlos Matos" —who I again believe to be ORTEGA-MARTINEZ—called UPS asking about the parcels. A UPS employee told him the parcels had left the store on a truck earlier that day. The clerk asked for a phone number to call him back and was provided phone number (849) 284-0730. The UPS clerk later called telephone number (849) 284-0730, and the number was not in service.

56.     Agents obtained a photograph of the UPS store telephone that displayed the caller ID when "Carlos Matos" called.  The following is a photograph taken of the UPS store telephone.

25



57.    Agents conducted an in-depth query of the phone numbers. ATF agents learned that (561)-590-5700 is an active phone number that is associated with the cellphone provider.  In addition, it was learned that the phone number (849) 284-0730 was not associated with any person or cellphone provider.

58.    On November 4, 2024, Agents went to a different UPS store in the general area.  Once Agents provided the same information ORTEGA-MARTINEZ utilized at the previous UPS location.  The UPS SA mentioned that she vaguely remembered ORGETA-MARTINEZ.  One Agents provided a photograph of the parcels containing firearms from the other UPS location, the SA stated that she remembers those exact boxes being shipped from her store.  The UPS SA then queried her system, which showed that ORTEGA-MARTINEZ had shipped seven of those specific parcels to the same freight forwarder, Global International Export Company.  I believe that ORTEGA-MARTINEZ and CEPEDA-GARCIA are shipping the firearms to this freight forwarding company to get the firearms into the Dominican Republic, affecting interstate nexus.

59.    On November 5, 2024, a SW was obtained for the phone number (561)-590-5700. Once the tracking information was available, it showed that the pings were near 213 Wildflower Road, Davenport, Florida, 33837.

60.    On November 13, 2024, agents conducted surveillance at 213 Wildflower Road, Davenport, Florida, 33837, and immediately observed the Infinity Q50. ORTEGA-MARTINEZ was observed going in and out of the residence for most of the morning. ORTEGA-MARTINEZ was then observed getting into Infinity Q50 and departing. Photographs of the surveillance are below.






61.    On November 19, 2024, ATF executed three warrants in connection with this investigation. The first search warrant was for the residence occupied by Jonathan ORTEGA-MARTINEZ, located at 213 Wildflower Rd, Davenport, FL 33837. From that residence, agents recovered firearms packing materials, which resembled boxes utilized to conceal firearms.

62.    The second search warrant was for ORTEGA-MARTINEZ's vehicle. A receipt to a storage unit registered to Maicor CEPEDA-GARCIA was found in the vehicle.

63.    A third search warrant was for the residence belonging to Maicor CEPEDA-GARCIA, located at 199 Ronda Ct, Davenport, FL 33837. Agents recovered two firearms from that residence. Agents also located receipts for a storage unit registered to CEPEDA-GARCIA. The storage unit receipts shared the information discovered in ORTEGA-MARTINEZ's vehicle, indicating they were both utilizing the storage unit.

64.    Agents received consent from CEPEDA-GARCIA to search the storage unit. Inside the storage unit, seven firearms and packaging materials were located. The packaging materials were consistent with those intercepted by agents previously.

65.    On the same day, CEPEDA-GARCIA was interviewed. Post-*Miranda*, CEPEDA-GARCIA denied being responsible for packaging and exporting firearms internationally. Nevertheless, he admitted that ORTEGA-MARTINEZ was acquiring firearms, concealing them in packages, and sending them internationally.

ORTEGA-MARTINEZ evoked his right to an attorney and provided no information.

## CONCLUSION

66.    Based on the foregoing facts and opinions, I believe that there is probable cause that ORTEGA-MARTINEZ is engaged in firearms tracking, in violations of 18 USC 933 (Firearms Trafficking). Pursuant to 18 USC § 933, it is unlawful for any person to:

> (1) ship, transport, transfer, cause to be transported, or otherwise dispose of any firearm to another person in or otherwise affecting interstate or foreign commerce, if such person knows or has reasonable cause to believe that the use, carrying, or possession of a firearm by the recipient would constitute a felony (as defined in section 932(a));

> (2) receive from another person any firearm in or otherwise affecting interstate or foreign commerce, if the recipient knows or has reasonable cause to believe that such receipt would constitute a felony; or

> (3) attempt or conspire to commit the conduct described in paragraph (1) or (2).

67.    Pursuant to 18 USC § 932(a), a felony is defined as either, 1) a "drug trafficking crime," 2) a "federal crime of terrorism," or 3) "any offense under Federal or State law punishable by imprisonment for a term exceeding 1 year."

68.    Here, there are at least two felonies punishable by imprisonment for a term exceeding 1 year, which I believe CEPEDA-GARCIA and ORTEGA-MARTINEZ had reasonable cause to believe would be committed. First, pursuant to 18 USC § 922(a)(1) (dealing firearms without a license) it is unlawful for any person:

A) except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce; or

B) except a licensed importer or licensed manufacturer, to engage in the business of importing or manufacturing ammunition, or in the course of such business, to ship, transport, or receive any ammunition in interstate or foreign commerce.

69.    Second, pursuant to 18 USC § 922(a)(5), "it is unlawful for any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) to transfer, sell, trade, give, transport, or deliver any firearm to any person who the transferor knows or has reasonable cause to believe does not reside in the State in which the transferor resides."

70.    CEPEDA-GARCIA and ORTEGA-MARTINEZ both received and transferred, or otherwise disposed of hundreds of firearms which they knew would affect interstate or foreign commerce, with many of them ending up in the Dominican Republic. Furthermore, as corroborated by CD-2, CEPEDA-GARCIA and ORTEGA-MARTINEZ both knew that the individuals they were receiving firearms from, like CD-2 himself, as well as those they were sending firearms to, were not licensed importers, licensed manufacturers, or licensed dealers. As such, CEPEDA-GARCIA and ORTEGA-MARTINEZ were receiving firearms from, and sending firearms to, individuals they knew were not licensed dealers. Furthermore, they were engaging in this conduct from the state of Florida, and sending those firearms to individuals they had reasonable cause to believe were not in their state, who were outside the United States in the Dominican Republic. As such, I believe

CEPEDA-GARCIA and ORTEGA-MARTINEZ had reasonable cause to believe they and their co-conspirators were dealing in firearms without a license, in violation 18 USC § 922(a)(1) as well as transporting firearms to individuals who did not residence in their state, in violation of 18 USC § 922(a)(5).

71.     This current investigation has revealed that since 2023, to present, a firearms trafficking organization has been recruiting straw purchasers and has illegally acquired over 1,000 firearms, primarily in the Middle District of FL, and smuggled the firearms to the Dominican Republic.

72.     CEPEDA-GARCIA and ORTEGA-MARTINEZ are two leading individuals engaged in this gun trafficking conspiracy who have been identified as gun traffickers by witnesses, which has been corroborated by my investigation.  That witness has observed them both engaging in firearm trafficking, which was described to take place in the Middle District of Florida.

73.     Witnesses from both UPS locations have positively identified ORTEGA-MARTINEZ or the specific parcel he is shipping.  In addition, those same witnesses have confirmed that he has collectively sent 30 parcels to the same freight forwarding company in Miami since April 2024.

74.     The most recent parcels obtained showed them engaging in gun trafficking as recently as November 2024. I believe once the parcels containing the concealed firearms have made their way to the freight forwarder in Miami, they are then sent internationally to the Dominican Republic.

75.    I further believe that CEPEDA-GARCIA and ORTEGA-MARTINEZ take extreme measures to conceal firearms in parcels because they are aware that it is illegal to traffic firearms utilizing shipment methods outside of the United States and are being delivered to countries that have strict guidelines for the possession of firearms. Lastly, I believe they rely on straw purchasers because if discovered, the firearms could not be traced back to them.

76.    Based on the foregoing facts and opinions, I believe that there is probable cause that ORTEGA-MARTINEZ is engaged in firearms tracking, in violations of 18 USC 933 (Firearms Trafficking).

Respectfully submitted,

Dwayne Smith Special Agent, ATF

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41 (d) (3), before me this __20__ day of November 2024

HONORABLE CHRISTOPHER P. TUITE
United States Magistrate